IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

DIANE R. WINTER,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

No. C08-2059

REPORT AND RECOMMENDATION

_____

## TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   PRINCIPLES OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.    Winter's Education and Employment Background. . . . . . . . . . . . . 5
     B.    Administrative Hearing Testimony. . . . . . . . . . . . . . . . . . . . . . 5
          1.    Winter's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          2.    Vocational Expert's Testimony. . . . . . . . . . . . . . . . . . . . 7
     C.    Winter's Medical History. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.    CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     A.    ALJ's Disability Determination. . . . . . . . . . . . . . . . . . . . . . . 14
     B.    Objections Raised by Claimant. . . . . . . . . . . . . . . . . . . . . . . 16
          1.    Credibility Determination. . . . . . . . . . . . . . . . . . . . . . . 16
          2.    Dr. Trimble's Opinions. . . . . . . . . . . . . . . . . . . . . . . . 19
          3.    The Hypothetical Question. . . . . . . . . . . . . . . . . . . . . . 23

VI.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.  RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 2) filed by Plaintiff Diane R. Winter on September 10, 2008, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Winter asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Winter requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On October 5, 2005, Winter applied for disability insurance benefits. In her application, Winter alleged an inability to work since November 8, 2004 due to fibromyalgia, osteoarthritis, chronic fatigue, anxiety, and shoulder, low back, knee, and ankle pain. Winter's application was denied on December 15, 2005. On February 28, 2006, her application was denied on reconsideration. On April 24, 2006, Winter requested an administrative hearing before an Administrative Law Judge ("ALJ"). On September 13, 2007, Winter appeared with counsel[1] via video conference before ALJ Thomas Donahue for an administrative hearing. Winter, Winter's husband, Lee Winter, and vocational expert Vanessa May testified at the hearing. In a decision dated February 29, 2008, the ALJ denied Winter's claims. The ALJ determined that Winter was not disabled and not entitled to disability insurance benefits because she could perform her past relevant work as a case aide, and she was functionally capable of performing other work that exists in significant numbers in the national economy. Winter appealed the ALJ's decision. On July 17, 2008, the Appeals Council denied Winter's request for review. Consequently, the ALJ's February 29, 2008 decision was adopted as the Commissioner's final decision.

---

[1] Winter's current counsel is Ronald J. Wagenaar. At the administrative hearing, Winter was represented by attorney Jackie D. Armstrong.

On September 10, 2008, Winter filed this action for judicial review. The Commissioner filed an Answer on November 3, 2008. On December 3, 2008, Winter filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she could perform her past relevant work as a case aide or other work that exists in significant numbers in the national economy. On January 28, 2009, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On February 6, 2009, Winter filed a reply brief. On April 7, 2009, Chief Judge Linda R. Reade referred this matter to a Magistrate Judge for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 405(g), the Court has the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id.* "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir.

3

2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 484 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls withing the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) ("As long as substantial evidence in the record supports the Commissioner's decision, we may not

4

reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.").

## IV. FACTS

### A. Winter's Education and Employment Background

Winter was born in 1957. She completed the twelfth grade in school. At the time of the hearing, she was taking a college course in accounting and had completed 42 hours of college credit.

The record contains a detailed earnings report for Winter. The report covers Winter's employment history from 1980 to 2007. During that time period, Winter worked primarily for American Baptist Homes of the Midwest ("ABHM"). She held several positions at ABHM, including nurse's aide, med aide, clerk, activities director, and social services and marketing aide. From 1980 to 2004, Winter earned between $5,897.61 (1982) and $32,868.82 (1998). The record shows no earnings from 2005 to 2007.[2]

### B. Administrative Hearing Testimony

#### 1. Winter's Testimony

At the administrative hearing, the ALJ questioned Winter regarding her ability to work. The ALJ noted that Winter was going to school, selling Mary Kay products, and volunteering for an Alzheimer's group, and asked "[w]hat, what is it, what's the reason you can't just be working?"[3] Winter answered that the Mary Kay job and volunteer work were flexible and allowed her to choose when and how long she worked. Winter also stated that she was going to school in order to get education for a secretarial job which would allow her to sit, move around, and change positions throughout a workday. The ALJ continued to question Winter:

---

[2] At the hearing, Winter testified that she worked as a Mary Kay consultant in 2006 and 2007, but she had nominal earnings. *See* Administrative Record at 371-72.

[3] *See* Administrative Record at 372.

> Q: But you're saying you think in the future you'd be able to do one of these jobs when you get a little more training. Is that what you're saying or not?
>
> A: I'm hoping to be able to be a legal secretary specialist. I know at that job you answer the phone, and you get up and move and make copies. And you can do different positions instead of like just sitting.

(Administrative Record at 373.)

Next, the ALJ questioned Winter about her functional abilities. When asked whether she does housework, Winter responded that she does some "light pick-up," but her family does most of the housework. She also stated that she does some light yard work, such as picking up light sticks or watering plants. The ALJ asked Winter to describe her typical day:

> A: I get up about 7:00 in the morning.
>
> Q: And what do you do the rest of the day?
>
> A: Most days, . . . I will get up and slowly take a shower, get dressed and do a little something around the house, like maybe put away some clothes or, you know, that I've got laying around, or I go out and sit down and read. If by chance somebody needs a ride someplace, like my niece or somebody like that, I would take them. I just try to keep as active as possible, but I also can take short breaks in the recliner.

(Administrative Record at 374.) Winter also testified that she could: (1) lift between 5 and 10 pounds, (2) sit between 15 and 20 minutes, (3) stand between 15 and 20 minutes, and (4) walk three blocks or about 10 minutes.

At the administrative hearing, Winter's attorney also questioned Winter regarding her pain and limitations. Winter's attorney asked Winter:

> Q: What limits you most in terms of the pain in, what area of your body is most painful and most limiting?
>
> A: That's a toss-up between the lower right back and the right neck. It would be about from the skull down into the shoulder and into the shoulder blade. That's where it hurts the most.

6

Q:   And what kinds of things make, let's take them one at a time. What kings of things make your neck hurt worse?

A:   If I reach up for something, or I'm carrying an item. I don't use a purse anymore. I try to use a fanny pack if I'm going anywhere, or I put my stuff in a billfold because I can't stand the weight of a purse or a shoulder, thing on my shoulder or anything hanging off them.

Q:   Does typing or other repetitive activity with your hands cause pain?

A:   Yeah. That, typing would, it's in my neck where it hurts, and down into the shoulder blades on mostly the right side, but it does do the left side also at the same area, the skull down to the shoulder blades.

Q:   How long can you type before you have to stop?

A:   I would guess five to ten minutes, because then I, I do the neck exercises that the doctor told me to do.

Q:   And how long, then, do you have to wait before you resume the typing activity?

A:   It usually takes me three to four minutes to do the exercises.

Q:   And then can you go right back to the typing?

A:   I do type, but I usually type slower as, as it goes on.

Q:   So if you were to start typing and then interrupt it with exercises to help, how long total could you type before you would have to stop?

A:   I'm not exactly sure. It might take, it might be up to an hour depending on the day.

(Administrative Record at 382-84.)

### 2.   *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who:

> [c]an lift 20 pounds occasionally, 10 pounds frequently, sitting up to two hours at a time for six of an eight-hour day, standing up to 30 minutes at a time for two of an eight-hour day, walking up to two blocks. . . . Only occasional climbing of ramps and stairs, only occasional kneeling, crouching,

7

> crawling and bending.  Would need a[n] average stress-level
> job and should not be working at height.

(Administrative Record at 396.)  The vocational expert testified that under such limitations, Winter could perform her past work as a cosmetics salesperson or case aide.  The vocational expert also testified that Winter could perform the following unskilled work: (1) parking lot attendant (450 positions in Iowa and 120,000 positions in the nation), (2) office helper (1,200 positions in Iowa and 111,000 positions in the nation), and (3) order clerk (2,400 positions in Iowa and 289,000 positions in the nation).

The ALJ provided the vocational expert with a second hypothetical for an individual who could:

> [lift] ten pounds occasionally, five pounds frequently, sitting
> and standing up to two hours at a time for six of an eight-hour
> day, walking up to two blocks.  Only occasional climbing of
> ladders, stairs, balancing, stooping, kneeling, crouching,
> crawling.  Also no working at heights.  [The individual] would
> require frequent unscheduled rest breaks.  And due to chronic
> pain syndrome, depression or any other reason the [individual]
> would miss three or more days of work per month.

(Administrative Record at 397.)  The vocational expert testified that under such limitations, Winter could not be substantially gainfully employed.

### C.  Winter's Medical History

On June 23, 2003, Winter had an appointment with Dr. Bruce Harlan, M.D., for a "recheck" of hypertension and anxiety.  At the appointment, Winter informed Dr. Harlan that she had "some aching in various parts of her body" and wondered whether she "might suffer from fibromyalgia."[4]  After examining her, Dr. Harlan diagnosed Winter with fibromyalgia.[5]  On September 24, 2003, Winter met with Dr. Harlan for a

---

[4] *See* Administrative Record at 215.

[5] Dr. Harlan's treatment notes from Winter's June 2003 visit do not provide his reasoning for diagnosing Winter with fibromyalgia.  *See Id.*

"recheck" of her anxiety, hypertension, and fibromyalgia. Winter reported that she thought her problems were "stable." However, she continued to claim that she suffered from body aches at times. Dr. Harlan continued the diagnosis of fibromyalgia and suggested weight loss as treatment. On March 24, 2004, Winter had another follow-up appointment with Dr. Harlan. She informed Dr. Harlan that she had "a little bit of generalized body aching," but believed that her health problems were "stable."[6] Upon examination, Dr. Harlan found that Winter's fibromyalgia was "controlled with medication." At a follow-up visit on June 24, 2004, Dr. Harlan noted that Winter's fibromyalgia was "stable." On December 10, 2004, Winter met with Dr. Harlan complaining of "some" aching in her lower back which occurred everyday. Upon examination, Dr. Harlan found "[m]ild tenderness of lower back to palpation and movement is noted."[7] Dr. Harlan diagnosed her with low back pain and fibromyalgia. Dr. Harlan recommended weight loss and the use of Ibuprofen or Tylenol as treatment. On January 27, 2005, Winter saw Dr. Harlan for continued low back pain. Upon examination, Dr. Harlan found: (1) Mild tenderness to palpation and movement of lower back; (2) deep tendon reflexes intact in all areas; (3) no sensory deficit anywhere; (4) Winter had the ability to walk on heels and toes without difficulty; and (5) x-rays showed some degenerative joint changes in the lumbosacral spine area. Dr. Harlan diagnosed Winter with degenerative joint disease, lower back pain and marked obesity. Dr. Harlan recommended weight loss and medication as treatment.

On October 17, 2005, Winter was referred to Dr. R. Bruce Trimble, M.D., by Dr. Harlan for evaluation of her musculoskeletal discomfort and "possible fibromyalgia." According to Dr. Trimble's notes, Winter reported that she had "long-standing low back discomfort, which has gotten to the point that she cannot stand on her feet more than about

---

[6] *See* Administrative Record at 210.

[7] *Id.* at 197.

fifteen minutes."[8]  Winter also indicated that prolonged sitting caused her low back discomfort.  Upon examination Dr. Trimble found:  (1) Winter's muscle strength was grossly normal throughout her body; (2) full range of motion of all joints; (3) no joint swelling, warmth, or deformity; (4) mild tenderness in her knees; (5) mild tenderness in her upper back; (6) some lumbar lordosis; and (7) discomfort on fist percussion of the lower lumbar spine and extremes of motion of the lumbar spine.  Dr. Trimble opined that:

> Although some of the discomfort might be labeled fibromyalgia, I think her big problem is spondylolisthesis and her weight, causing increasing discomfort in her back and discomfort in her feet. . . .  The situation is probably complicated by the depression.

(Administrative Record at 228.)  Dr. Trimble recommended weight loss, aggressive treatment of depression, and the use of Tylenol as treatment.  Lastly, Dr. Trimble opined that "I think that the back is a sufficient problem that she for the time being cannot work on a regular basis at a job which requires her to be on her feet for more than ten or fifteen minutes at a time, or requires prolonged sitting."[9]

On November 9, 2005, Dr. J.D. Wilson, M.D., reviewed Winter's medical records and provided Disability Determination Services ("DDS") with a Physical Residual Functional Capacity ("RFC") assessment for Winter.  Dr. Wilson determined that Winter could:  (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations.  Dr. Wilson also determined that Winter could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Dr. Wilson found no manipulative, visual, or communicative limitations for Winter.

---

[8] *See* Administrative Record at 227.

[9] *See* Administrative Record at 229.

Lastly, Dr. Wilson determined that Winter should avoid concentrated exposure to extreme cold and wetness.

On December 2, 2005, at the request of DDS, Winter underwent a psychological examination by Dr. Lorne A. Johnson, Psy.D. Upon examination, Dr. Johnson found that:

> Mrs. Winter . . . is experiencing a moderate degree of depression and also has generalized anxiety. Assessment of panic symptoms were actually quite minimal. She is very overweight and suffers from a number of medical problems which more than likely contribute to her problems with depression.
>
> In this respect, she probably has some mild deficits in her ability to remember and understand instructions, procedures, and locations as well as mild deficits in concentration. She is fully able to interact appropriately with supervisors, coworkers, and the public as well as to use good judgment and respond appropriately to changes in the workplace. She would be able to manage funds if they were so awarded.

(Administrative Record at 239.) Dr. Johnson assessed Winter a GAF score of 60.

On December 15, 2005, Dr. David G. Beeman, Ph.D., reviewed Winter's medical records and provided DDS with a Psychiatric Review Technique assessment for Winter. Dr. Beeman diagnosed Winter with dysthymic disorder and generalized anxiety. Dr. Beeman determined that Winter had the following limitations: mild restriction of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Beeman concluded that:

> The preponderance of evidence in file from a mental perspective indicates mild restrictions in [activities of daily living] and maintenance of concentration, persistence, and pace with no limitations in social functioning. [Winter's] condition is nonsevere, which is consistent with primary care provider records, the CE [consultative examiner's] MSE [mental status examination] findings, CE opinions, and daily

functioning reports. [Winter's] mental condition is considered
to be nonsevere.

(Administrative Record at 266.)

On January 22, 2007, Winter met with Dr. William J. Riesen, M.D., regarding her
fibromyalgia. Winter informed Dr. Riesen that she continued to have pain in her low back
and shoulders. With regard to her fibromyalgia, Dr. Riesen opined that Winter "is doing
well with exercise and I encouraged her to continue that."[10] Dr. Riesen also noted that
she had "some depressed mood" and recommended that she visit with psychiatry to
determine whether any medication adjustments would help her. Winter had a follow-up
appointment with Dr. Riesen on March 19, 2007. At her appointment, Winter reported
that she had pain in her lower back which made standing, walking, and sitting for long
periods of time difficult. She also reported pain in her upper back which made sitting and
typing at a computer for long periods of time difficult. Dr. Riesen further noted that
Winter had chronic fatigue and adapted to it by cleaning her house in parts each day,
instead of the entire house in one day. After examining Winter, Dr. Riesen concluded that
her fibromyalgia "[is a] difficult situation. She sounds stable. I did provide, at her
request, some instructions on physical exercise for back symptoms."[11]

On August 10, 2007, Winter met with Dr. Trimble for a "recheck" of her
fibromyalgia and degenerative disc disease. Dr. Trimble noted that Winter had lost 160
pounds since 2005 and felt better overall, but found that the weight loss had not helped her
musculoskeletal discomfort.[12] Upon examination, Dr. Trimble found that Winter had:
(1) discomfort on lumbar motion with some tenderness to fist percussion; (2) mild
limitation of neck motion with discomfort on motion; (3) full range of motion of all

---

[10] *See* Administrative Record at 296.

[11] *See* Administrative Record at 302.

[12] *See* Administrative Record at 356.

peripheral joints; (4) normal muscle strength throughout her body; (5) extensive degenerative disc disease with first degree spondylolisthesis of L5 on S1; and (6) modest degenerative disc disease with grade 1 retrolisthesis of C5 on C6. Dr. Trimble diagnosed Winter with fibromyalgia and degenerative cervical and lumbar disc disease. Dr. Trimble opined that "[i]t is possible that she might work but it would be in a limited fashion and I am not certain she really would be able to work sufficiently regularly and with sufficiently minimal restriction that she could have a job that would support her."[13] Dr. Trimble recommended weight reduction as treatment.

Dr. Trimble also provided Winter's attorney with an assessment of Winter's limitations due to her fibromyalgia. Dr. Trimble opined that Winter could walk two city blocks without rest or severe pain. Dr. Trimble further opined that Winter could sit for 20 minutes for a continual period and stand/walk for 15 minutes for a continual period. According to Dr. Trimble, Winter would need a job that allowed her to shift positions at-will from sitting, standing, or walking. Dr. Trimble also indicated that Winter could not tolerate prolonged sitting. Dr. Trimble opined that Winter could lift/carry up to 10 pounds in a competitive work setting and would have significant limitations with reaching above her head. Lastly, Dr. Trimble anticipated that on average, Winter would miss 3-5 days of work per month.[14]

---

[13] *Id.* at 357.

[14] *See also* Administrative Record at 353-54. Dr. Trimble requested a follow-up appointment with Winter on August 27, 2007, and provided the following opinions as to her functional limitations:

> I believe that [Winter's] back disease limits her ability to lift more than 5 or 10 pounds, stand for more than 15 or 20 minutes, or sit for more than 15 or 20 minutes without change in position. The situation is compounded by fibromyalgia. As a result of both of these problems, I doubt that she would be able to work a full 8-hour day; might need to have brief rests periods during the work day; and likely would periodically

(continued...)

On December 20, 2007, Winter met with Dr. Riesen for her "six-month recheck" for fibromyalgia. Winter reported that she had discomfort in her neck, shoulder blades, and lower back. She indicated that her discomfort was worse when she was fatigued. After examining her, Dr. Riesen concluded that Winter's fibromyalgia was "stable."

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Winter is not disabled. In making this determination, the ALJ was required to complete the five-step sequential evaluation process provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) the claimant's work activity, if any; (2) the medical severity of the impairment; (3) whether the medical severity of the impairment equals one of the listings in Appendix 1 of Subpart P; (4) the claimant's residual functional capacity (RFC) and past relevant work; and (5) whether the claimant can perform other jobs in the economy given the claimant's RFC, age, education, and work experience.

*Robson*, 526 F.3d at 392 (citing 20 C.F.R. § 404.1520(a)(4)); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (same). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not

---

[14](...continued)

> lose some time from work, perhaps three to five days a month.

> Pain and fatigue would limit her ability to concentrate in a sustained fashion on a task which required prolonged attention or was complex.

> I do not think that she is restricted in fine motions, fingering or reaching.

(Administrative Record at 354.)

disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*; *see also Goff*, 421 F.3d at 790 ("If the claimant establishes her inability to do past relevant work, then the burden of proof shifts to the Commissioner."). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545.

The ALJ applied the first step of the analysis and determined that Winter had not engaged in substantial gainful activity since November 4, 2004. At the second step, the ALJ concluded from the medical evidence that Winter had the following severe combination of impairments: obesity, L5 spondylosis, fibromyalgia, hypertension, dysthymic disorder, generalized anxiety disorder, and asthma. At the third step, the ALJ found that Winter did not have an impairment or combination of impairments listed in "20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Winter's RFC as follows:

> [Winter] has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently. She can sit two hours at a time for at least six hours of an 8-hour workday. She can

stand 30 minutes at a time for up to two hours of an 8-hour workday. She can occasionally climb ramps and stairs; kneel; crouch; crawl; or bend. She can perform an average stress level job. She should avoid working at heights.

(Administrative Record at 26.) At the fourth step, the ALJ determined that Winter could perform her past relevant work as a case aide. At the fifth step, the ALJ also determined that based on her age, education, previous work experience, and RFC, Winter could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Winter was not disabled.

### B. Objections Raised by Claimant

Generally, Winter argues that the ALJ's decision should be reversed because it is not supported by substantial evidence on the record as a whole. Specifically, Winter argues that the ALJ erred in three respects. First, Winter argues that the ALJ failed to properly evaluate her subjective allegations of disability. Second, Winter argues that the ALJ failed to properly weigh the opinion evidence from Dr. Trimble. Third, Winter argues that the ALJ erred by posing a hypothetical question to the vocational expert which was incomplete and not supported by substantial evidence.

### 1.    Credibility Determination

Winter argues that the ALJ failed to properly evaluate her subjective complaints of disability. Winter maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Winter's testimony and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski,*

739 F.2d at 1322. The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ

explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In his decision the ALJ provided the following reasons for finding Winter's subjective allegations of disability not credible: (1) Her work ended in 2004 due to job misconduct rather than any physical or mental impairments;[15] (2) her medical records were contrary to her allegations of disabling impairments;[16] (3) her daily activities, including going to school, were contrary to her allegations of disabling symptoms and impairments;[17] (4) her lack of pain medication was not consistent with her allegations of disabling pain;[18] and (5) medication and prescribed treatment reduced, resolved, or controlled her symptoms.[19]

It is clear from the ALJ's decision that he considered and discussed Winter's daily activities, treatment history and medical history, use of medication, and functional restrictions in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Winter's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each

---

[15] *See* Administrative Record at 27.

[16] *Id*. at 27; 29-30.

[17] *Id*. at 27-28; 30.

[18] *Id*. at 29.

[19] *Id*. at 29-30.

*Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Winter's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. *Dr. Trimble's Opinions*

In determining the weight to be afforded Dr. Trimble's opinions, the ALJ determined:

> In August 2007, an examining doctor expressed an opinion that
> [Winter] was greatly functionally limited. The undersigned
> attributes no weight to the opinions expressed. The examining
> doctor is not [Winter's] treating doctor-- [Winter] was seen on
> referral from [Winter's] treating doctor. The doctor has not
> had a long-term treatment relationship to gain in-depth insight
> into [Winter's] functioning. The doctor's opinions are not well
> supported. The doctor's opinions are not consistent with other
> evidence and inconsistencies in the record as a whole. The
> doctor appears to have based his opinion on [Winter's]
> subjective allegations which are overstated/exaggerated and
> entitled to little weight. In so far as the doctor has relied upon
> [Winter's] less than fully accurate representations concerning
> the existence, persistence and intensity of symptoms and
> functional limitations, the doctor's resulting opinion likewise
> is not an accurate representation of [Winter's] ability to
> function.

(Administrative Record at 30.)

First, Winter disagrees with the ALJ's classification of Dr. Trimble as an "examining" doctor instead of a "treating" doctor. The Regulations define a "treating source" as:

> your own physician, psychologist, or other acceptable medical
> source who provides you, or has provided you, with medical

> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you. Generally, we will consider
> that you have an ongoing treatment relationship with an
> acceptable medical source when the medical evidence
> establishes that you see, or have seen, the source with
> frequency consistent with accepted medical practice for the
> type of treatment and/or evaluation required for your medical
> condition(s). We may consider an acceptable medical source
> who has treated or evaluated you only a few times or only
> after long intervals (e.g., twice a year) to be your treating
> source if the nature and frequency of the treatment or
> evaluation is typical for your condition(s). We will not
> consider an acceptable medical source to be your treating
> source if your relationship with the source is not based on your
> medical need for treatment or evaluation, but solely on your
> need to obtain a report in support of your claim for disability.
> In such a case, we will consider the acceptable medical source
> to be a nontreating source.

20 C.F.R. § 404.1502; *see also Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006)
("'Treating source' is defined as the claimant's 'own physician, psychologist, or other
acceptable medical source' who provides the claimant with medical treatment or evaluation
on an ongoing basis.").

In October 2005, Winter's treating doctor, Dr. Harlan, referred her to Dr. Trimble
for consultation on musculoskeletal discomfort and possible fibromyalgia. After examining
her, Dr. Trimble recommended weight loss, aggressive treatment of depression, and use
of Tylenol as treatment. Dr. Trimble's notes provided "[n]o return appointment
scheduled."[20] Dr. Trimble next saw Winter on August 10, 2007, for a "recheck on
fibromyalgia and degenerative disk disease."[21] On that same date, Dr. Trimble also filled

---

[20] *See* Administrative Record at 229.

[21] *Id.* at 356.

out a questionnaire provided by Winter's attorney, entitled "Do I have Fibromyalgia."[22] After examining Winter, Dr. Trimble decided to get an MRI of her neck. Dr. Trimble saw Winter on August 15, 2007, to discuss the results of her MRI. In his August 15, 2007 notes, Dr. Trimble stated "[Winter] will return to the care of William Riesen, MD, but I would be happy to review again if he and she feel that would be useful."[23] Winter's only other visit to Dr. Trimble was on August 29, 2007. According to Dr. Trimble's notes, he requested to see Winter again because he "apparently misunderstood her plans to apply for Social Security Disability at the last visit, I called her back in to clarify all of this in order to give a statement to her attorney."[24] Having reviewed the entire record, the Court finds that Winter did not see Dr. Trimble on an ongoing basis. Her first visit with Dr. Trimble was a referral for consultation by her treating doctor and her second and third visits were for the purposes of providing information to Winter's attorney for her disability claim. Moreover, Dr. Trimble's notes from both 2005 and 2007 state that he did not need to see Winter again, unless her treating doctor wanted him to consult further. Accordingly, the Court finds that under the Regulations, the ALJ properly evaluated Dr. Trimble as an examining source rather than as a treating source. *See* 20 C.F.R. § 404.1502.

Turning to the ALJ's determination regarding the weight to be afforded Dr. Trimble's opinions, the Court bears in mind that an ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. §§ 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It

---

[22] *Id.* at 350-52.

[23] *See* Administrative Record at 355.

[24] *Id.* at 353.

is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Having reviewed the entire record, the Court finds that the ALJ considered Dr. Trimble's opinions in accordance with the factors discussed in *Wiese*. *See also* 404.1527(d). The ALJ determined that Dr. Trimble's opinions were inconsistent with the record as a whole.[25] Additionally, the ALJ found that Dr. Trimble's opinions relied too heavily on Winter's subjective allegations of disability. Thus, because the ALJ discredited Winter's subjective allegations, he also discredited Dr. Trimble's opinions. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("The ALJ determined that [the claimant's] pain was not as severe as she alleged[.] . . . Therefore, the ALJ acted properly in disregarding those portions of [the doctor's] report that were based on [the claimant's] subjective descriptions to him of her pain levels. *See Gaddis v. Chater*, 76 F.3d 893, 895-96 (8th Cir. 1996) (ALJ may discount physician's opinion that is based on discredited subjective complaints)."). Accordingly, the Court finds no error in the ALJ's determination regarding the weight afforded to Dr. Trimble's opinions and determines that the ALJ's determination is supported by substantial evidence on the record as a whole. *See Owen*, 551 F.3d at 798. The Court further finds that the ALJ properly rejected Dr. Trimble's opinions because they were inconsistent with the record as a whole. *See Wagner*, 499 F.3d at 848. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

---

[25] *See* Administrative Record at 27-29 (ALJ discussing Winter's medical records and finding that they do not support her allegation of disability).

### 3. *The Hypothetical Question*

Winter argues that the ALJ's first hypothetical question to the vocational expert did not adequately describe her limitations because the ALJ failed to include her subjective allegations of disability and the opinions of Dr. Trimble in the question. Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).")). In Sections *V.B.1* and *V.B.2.* of this decision, the Court determined that the ALJ made a proper credibility determination for Winter and properly discounted the opinions of Dr. Trimble. Therefore, the Court finds that the ALJ did not err by not including Winter's subjective allegations and Dr. Trimble's opinions in the hypothetical questions. *See Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible).

### VI. CONCLUSION

The Court finds that the ALJ made a proper credibility finding with regard to Winter's subjective allegations of disability, properly rejected the opinions of Dr. Trimble, and provided the vocational expert with appropriate hypothetical questions. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and should be affirmed.

## *VII. RECOMMENDATION*

For the reasons set forth above, I respectfully recommend that the district court **AFFIRM** the final decision of the Commissioner of Social Security and **DISMISS** with prejudice Plaintiff's Complaint (docket number 2) filed on September 10, 2008.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.

DATED this _____ day of June 2009.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA